LAWRENCE P. MANN and
LINDA S. MANN,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA,

    Defendant.

Civil Action No. TDC-17-0200

## MEMORANDUM OPINION

Plaintiffs Lawrence P. Mann and Linda S. Mann ("the Manns") have filed this tax refund suit against the United States of America to challenge the disallowance by the Internal Revenue Service ("IRS") on their 2011 joint tax return of three claimed charitable deductions: (1) $675,000 for the donation of a house; (2) $24,206 for the donation of personal property in that house, and (3) $10,000 in cash to Second Chance, Inc. ("Second Chance"), a non-profit property deconstruction organization. They also challenge the disallowance on their 2012 joint tax return of a claimed charitable deduction of $1,500 to Second Chance. The IRS has moved for summary judgment on all claimed deductions. The Manns oppose the IRS's Motion and have filed a Cross Motion for Summary Judgment seeking summary judgment in their favor on the issue of the cash donations and partial summary judgment on the issue of the house donation. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the IRS's Motion is GRANTED IN PART and DENIED IN PART, and the Manns' Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In April 2011, the Manns purchased real property located at 5300 Moorland Lane in Bethesda, Maryland ("the Property"). At the time the Manns purchased the Property, it included a remodeled colonial-style house ("the House") in good condition. However, the Manns later discovered that the House had a wet basement, and given that they also did not consider the layout to be suitable to their needs, the Manns decided to have the House demolished and to build a new home on the Property. At no point before the demolition did the Manns reside in the House.

The Manns hired Potomac Valley Builders to demolish the House and to build a new residence on the Property. Prior to the demolition, the Manns contacted Second Chance about donating the House. Second Chance is a charitable organization under section 501(c)(3) of the Internal Revenue Code ("§ 501(c)(3)") that engages in property "deconstruction," the salvaging of building materials, fixtures, and furniture from properties. Joint Statement of Undisputed Facts ("JSUF") ¶ 16, ECF No. 33. Second Chance's deconstruction employees are disadvantaged individuals in need of workforce training. Second Chance provides these employees with general life-skills training and also, through its deconstruction projects, with specific work skills. Employees are paid an hourly wage. Second Chance sells some salvaged items at its retail store and endeavors to recycle the rest. Although Second Chance performs deconstruction, it does not perform demolition and advises potential donors to that effect. Second Chance's deconstruction efforts at times result in destruction of parts of the subject property, either because disassembly requires some destruction or because destruction is useful in training employees in proper deconstruction methodology.

To defray the costs of the deconstruction program and workforce training, Second Chance asks individuals who are donating property for deconstruction to supplement their donation with

cash, in an arrangement called a "funded deconstruction." JSUF ¶ 26. Second Chance rarely undertakes deconstruction projects absent a supplementary cash donation. Unfunded projects are referred to as "mission projects" and are undertaken only if they involve property or material of historical significance. JSUF ¶ 28.

On December 1, 2011, Linda Mann signed an agreement with Second Chance to donate the House for deconstruction. That agreement stated that Linda Mann was "legal title holder" of "Premises" defined as "a certain lot or parcel of ground, currently improved by a residential dwelling unit known as 5300 Moorland Lane, Bethesda, Maryland" and that she wished to "contribute to Second Chance the existing single-family residential dwelling upon such Premises." Joint Record ("J.R.") 494, ECF Nos. 40-1 to 40-37. Specifically, Linda Mann conveyed to Second Chance all of her rights, title, and interest in "the improvements, building and fixtures located on the Premises." *Id.* The conveyance expressly excluded a shed located on the Property. That same day, Linda Mann signed a second agreement with Second Chance conveying various furniture and other personal property ("the Personal Property") in and around the House.

As to the tax implications of Second Chance's deconstruction services, in a December 20, 2011 email to Lawrence Mann, a deconstruction sales manager for Second Chance explained that generally, donors could claim a tax deduction for all material that "crosses the threshold of [the Second Chance] warehouse." J.R. 508. The manager stated that Second Chance would create a manifest list of everything it removed from a site, and that the fair market value of those items could then be deducted, with the value to be determined by a qualified appraiser. The manager stated that Second Chance expected deconstruction of the House to yield items with a fair market value of at least $150,000 at a "conservative minimum," which would translate to a tax savings of approximately $45,000. *Id.* The Manns were also expected to make a $20,000 cash donation to

Second Chance, to offset the over $20,000 Second Chance expected to spend on the deconstruction, leaving the Manns with approximately $25,000 to $30,000 in tax savings. That donation level was based on Second Chance's estimate of the Manns' "lowest expected outcome," with the hope that the Manns would make additional contributions "based on an improved outcome as we discussed." J.R. 509. Second Chance provided a worksheet outlining the estimated financial benefits to the Manns from the deconstruction in which it deemed the cash donations to be fully deductible charitable contributions.

The Manns negotiated with Second Chance to spread the cash donation over two years, with $10,000 to be paid in 2011 and $10,000 to be paid in 2012. The Manns sent Second Chance a check for $10,000 dated December 31, 2011. In December 2012, the Manns sent Second Chance a second check in the amount of $1,500. In response to both contributions, Second Chance sent a letter acknowledging the donation, verifying that the Manns "did not receive anything of value in exchange" for the donation, and stating that "the entire value of your donation is tax-deductible." J.R. 516, 519.

As part of their planned donations, the Manns commissioned three appraisals, two of the value of the House, both with an effective date of October 12, 2011, and one of the value of the Personal Property, with an effective date of October 19, 2011. Using a sales comparison methodology, which relies on comparable home sales in the same neighborhood, the first House appraisal ("House Appraisal A") valued the entirety of the Property at $1,875,000, the Property without the House at $1,200,000, and thus the House specifically at $675,000. The $675,000 valuation figure was premised on consideration of the House at its highest and best use, which the appraiser determined was keeping the House intact but moving it to another site for use as a residence. The appraiser concluded that moving the entire House to another site would "produce

4

the highest return to the non-profit organization," and was thus superior to deconstruction, which would "destroy[] part of the structure during the process." J.R. 379.

Because House Appraisal A was based on the value of the House as moved intact to another site for residential purposes, the Manns obtained a second appraisal ("House Appraisal B") to establish the donation value of the House if it were deconstructed, and thus not put to its highest and best use. House Appraisal B was premised on what the appraiser characterized as the "extraordinary assumption" that the Manns had "conveyed full ownership rights of the structure to Second Chance Inc. with the understanding the entire structure is to be used by Second Chance Inc. for training purposes" and that any salvaged building materials would later be sold by Second Chance. J.R. 419. House Appraisal B valued the House at $313,353. This figure was derived by calculating the cost to construct the House with new building materials using the "R.S. Means Building Material Cost Estimating Software," subtracting out labor and administrative costs, and then accounting for depreciation, an approach used because of "the lack of a well[-]established second hand market for all building materials" used in the construction of the House. J.R. 419.

The Personal Property appraisal included an itemized list of 40 pieces of furniture or home decoration, individually valued and photographed. The total appraised value of those items was $24,206. This figure was calculated using the "R.S. Means method," which requires taking the cost of the items if new, subtracting labor and other costs, and depreciating the resulting "materials costs" by 42 percent to reflect that the items had an expected lifespan of 60 years and were approximately 25 years old. J.R. 307. Here, the appraiser calculated the new cost value of the 40 items at $372,000. Appended to the appraisal are several website listings for new versions of items comparable to those that were donated. For example, the appraisal includes the printout of a webpage offering new Adirondack style chairs for sale for $149.99 and $129.99; similar chairs at

5

the House are valued in the appraisal at $100.00. A gas fireplace at the House, listed new at $2,778, is valued at $2,500.

Deconstruction is generally divided into two phases: a first phase of interior deconstruction followed by a second phase of exterior deconstruction. On December 19, 2011, the Manns left the keys to the House for Second Chance. On December 22, 2011, Second Chance began the first phase of deconstruction, which was completed around January 17, 2012. The second phase was begun on June 19, 2012 and continued until July 6, 2012. In a July 6, 2012 email, Second Chance informed the Manns that they had not been able to extract as much salvage material from the House as they had hoped. Second Chance did not keep a manifest or other record of exactly what materials were salvaged from the House, but Lawrence Mann took about 50 photographs of the deconstruction process. Second Chance incurred approximately $13,144.35 in expenses in deconstructing the House. The deconstruction did not reduce the cost to the Manns of the later demolition of the House.

On their 2011 tax return, the Manns claimed charitable donations in the amount of $675,000 for the value of the House, $24,206 for the value of the Personal Property, and $10,000 for the cash donation to Second Chance. On their 2012 tax return, the Manns claimed a charitable deduction of $1,500 for the cash donation to Second Chance. In June 2014, the IRS disallowed all of these claimed donations. Accordingly, for 2011, the Manns were assessed an outstanding tax liability of $195,837 plus interest. For 2012 they were assessed an outstanding tax liability of $4,065 plus interest. The Manns' appeal of these determinations was denied in February 2015. In May 2015, the disallowance of the deductions was finalized, and the Manns were assessed tax liability of $191,638 for 2011 and $2,464 for 2012, together with statutory interest. After the Manns paid the outstanding tax debts so as to allow them to contest the disallowed deductions in

6

federal district court, on November 9, 2015 they filed claims for a refund for both tax years, seeking $209,914 for 2011 and $2,619 for 2012. In an effort to avoid litigating the 2011 deductions, the Manns filed an amended 2011 tax return in August 2016. In that amended return, they adjusted the claimed deduction for the donation of the House from $675,000 to $313,353, the value of the deconstructed House as determined in House Appraisal B, and accordingly sought a refund of $92,837. On January 23, 2017, the Manns filed suit in this Court seeking a determination that their original claimed deductions were valid and a full refund of the additional taxes paid in 2011 and 2012 as a result of the disallowance of the deductions.

## DISCUSSION

The IRS seeks summary judgment on all three categories of donations to Second Chance claimed by the Manns on their 2011 and 2012 taxes: the donation of the House, the donation of the Personal Property, and the cash donations. The IRS asserts that all of these deductions were properly rejected. The Manns, in turn, oppose the IRS's Motion in its entirety, seek summary judgment in their favor on the issue of the cash donations, and seek partial summary judgment on the issue of the donation of the House, on which they seek a determination that, as a matter of law, they donated an undivided property interest to Second Chance.

## I.     Legal Standards

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not

simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

United States district courts and the United States Court of Federal Claims have original jurisdiction over tax refund suits. *See* 28 U.S.C. § 1346(a)(1) (2012); *Dang v. Comm'r*, 259 F.3d 204, 208 (4th Cir. 2001). In such cases, the court undertakes a *de novo* review of the tax decision, because "a tax refund suit is not an appellate review of the administrative decision that was made by the IRS." *Wells Fargo & Co. and Subsidiaries v. United States*, 91 Fed. Cl. 35, 75 (2010); *see also Lewis v. Reynolds*, 284 U.S. 281, 283 (1932) (adopting the lower court's statement that a tax refund suit "involves a redetermination of the entire tax liability"). However, in a tax refund suit, "it is incumbent upon the claimant to show that the United States has money which belongs to him." *Lewis*, 284 U.S. at 283. Thus, the IRS's tax assessment is presumptively correct, and the taxpayer bears the burden of establishing by a preponderance of the evidence that the assessment was wrong. *Faulconer v. Comm'r*, 748 F.2d 890, 893 (4th Cir. 1984). As relevant here, the Internal Revenue Code ("the Code") allows taxpayers to deduct any charitable contribution paid

within a tax year to a tax-exempt organization if that donation can be substantiated in accordance with IRS regulations. 26 U.S.C. § 170(a)(1), (c)(2) (2012) ("§ 170").

## II.     The House

On the issue of whether the deduction for the value of the House was valid, the parties do not dispute the relevant facts. On December 1, 2011, Linda Mann signed an agreement with Second Chance conveying all of her rights, title, and interest in "the improvements, building and fixtures located on the Premises" located at 5300 Moorland Lane, Bethesda, Maryland, excluding a shed located on the Property. J.R. 494. There is no evidence that this agreement was recorded in the Montgomery County land records. Second Chance estimated that deconstruction of the House would yield items with a fair market value of at least $150,000, but kept no manifest of the salvaged items. Second Chance did, however, inform the Manns that ultimately it had not been able to salvage as much of the House as it had hoped. On their 2011 tax return, the Manns deducted the $675,000 appraised fair market value of the House as a residence to be used intact at another site, as calculated in House Appraisal A. When that deduction was rejected, they re-filed their 2011 tax return with a $313,353 deduction, the appraised deconstructed value of the House as calculated in House Appraisal B. The IRS also rejected that deduction.

The IRS now maintains that the Manns are not entitled under § 170 to either the original $675,000 fair market value deduction or the amended $313,353 deconstructed value deduction. The IRS asserts that in donating the value of the House, the Manns donated only a part of their interest in the Property, and that such partial-interest donations are impermissible under § 170. In opposition, the Manns assert that they had a discrete interest in the House that could be and was properly and separately donated pursuant to § 170.

9

"The Code generally restricts a taxpayer's ability to claim a charitable deduction for the donation of an interest in property which consists of less than the taxpayer's entire interest in such property," except in certain circumstances not present here. *Belk v. Comm'r of Internal Revenue*, 774 F.3d 221, 224 (4th Cir. 2014) (citing 26 U.S.C. § 170(f)(3)(A)). *See* 26 C.F.R. § 1.170A7(a)(1) (providing that "[i]n case of a charitable contribution . . . of any interest in property which consists of less than the donor's entire interest in such property, no deduction is allowed under section 170" except in certain limited circumstances). Whether a claimed donation of a property interest is of an entire interest, and thus properly deductible, or of a partial interest, and thus not properly deductible, is "ultimately a question of federal law," but "[t]he answer to this federal question ... largely depends upon state law" property rights. *United States v. Craft*, 535 U.S. 273, 278 (2002).

In Maryland, real property for tax purposes can consist of "land or improvements to land." Md. Code Ann. Tax–Property §1-101(gg)(1) (West 2002). Improvements to land include "buildings and structures of every kind." *Supervisor of Assessments of Balt. Cty. v. Greater Balt. Med. Ctr.*, 32 A.3d 174, 180 (Md. Ct. Spec. App. 2011) ("*GBMC*"). Ownership of improvements to land "follows title to the land," so "the owner of real property according to the land records also owns the improvements built thereon." *Id.* Thus, "for someone other than the record landowner to own the improvements on the land, there must be a recorded deed or other instrument of record showing transfer of the title to the improvements to another owner." *Id.* In short, the rule in Maryland is that "record ownership, not contractual ownership, demonstrates ownership of the improvements for real property tax purposes." *Id.* at 180 n.6.

In Maryland, then, it is possible to sever the property interest in improvements to real property from the land itself, such that it would have been possible for a donation of the House to be a conveyance of an entire property interest rather than a partial interest in the overall Property.

However, Maryland law is equally clear that the severance of the House from the Property and the transfer of the entire interest in the separated House would be valid for tax purposes only if that transaction is separately recorded in the land records. In *Townsend Baltimore Garage, LLC v. Supervisor of Assessments of Baltimore City*, 79 A.3d 960 (Md. Ct. Spec. App. 2009) ("*Townsend*"), the court held that although a contract between the state, as owner of certain real property, and a for-profit corporation provided that the corporation owned a parking garage on that real property, because no such agreement had been recorded in the land records, the state remained the record owner of the improvements on the real property for tax assessment purposes. *Id.* at 966-67.

Here, the Manns sought to convey a separate interest in the House to Second Chance through a private contract, but they never recorded that transaction in the land records. As a result, for tax purposes under Maryland law, the Manns have not properly severed the House from the Property and transferred ownership of it to Second Chance. *See id.*; *GBMC*, 32 A.3d at 180. As a result, the Manns' donation was comparable to granting a license to Second Chance to access and use the House for salvage and training purposes. *Cf. Patel v. Comm'r of Internal Revenue*, 138 T.C. 395, 411 (2012) (holding that, under Virginia law, a donation of a house but not the underlying land to a fire department to be burned as a training exercise was "a mere license to use the property"). Having failed to make a valid transfer of an entire interest in real property, no deduction is permitted. 26 U.S.C. § 170(f)(3)(A); *see also Patel*, 138 T.C. at 406 (holding that "[w]here a taxpayer contributes to a charity an interest in a building that is part of the land under State law but retains all title to and interest in the remaining land, the taxpayer has donated less than his entire interest in the land" and "will not be allowed a charitable contribution deduction"). Although the Manns note that *Patel* post-dates the Manns' donation of the House, such that "it

cannot be said that the Manns acted without reasonable cause and in good faith in claiming the deduction," Mann Cross-Mot Summ. J. at 11, ECF No. 37-1, the issue of good faith is relevant only to the question of whether penalties should be imposed, which is not at issue here. *See Patel*, 138 T.C. at 416–17. The Manns have identified no case law supporting the existence of an exception that would allow invalid charitable donations to proceed if made in good faith. *See Faulconer*, 748 F.2d at 893 (stating that the taxpayer has the burden to prove the IRS's assessment wrong).

The Manns assert that the Maryland case law on which this conclusion rests is inapt because it involves a tax assessment, rather than a tax deduction. However, the Manns point to no case or statute establishing any salient distinction between tax assessments and tax deductions in this context. *St. George Antiochian Orthodox Christian Church v. Aggarwal*, 603 A.2d 484 (Md. 1992), cited by the Manns, addresses the unrelated question of what notice is required in a foreclosure action and merely states in a footnote the general principle—consistent with *GBMC* and *Townsend*—that real property and improvements to real property are to be separately assessed for tax purposes. *Id.* at 488 n.8.

Likewise, the cases cited by the Manns in support of the undisputed point that, under Maryland law, improvements to land can be severed from real property do not alter the Court's conclusion. None address the question of the specific requirements under Maryland law for properly severing ownership interests in real property from ownership interests in improvements to land for tax purposes. *See Walker v. Schnidel*, 58 Md. 360, 360 (1882) (finding that fixtures such as tanks and distillery tubs that ordinarily are deemed part of the real property can be deemed personal property by agreement of the parties); *Baldwin v. Francis*, 84 A. 346 (1912) (finding that an agreement to allow a former owner to remove a bowling alley from the premises was valid);

12

*Bohle v. Thompson*, 554 A.3d 818, 823 (Md. Ct. Spec. App. 1989) (stating that an owner of a fixture and the owner of real property can agree that the fixture remains personal property). On that critical question, the Manns rely on *Westpark v. Seaton Land Co.*, 171 A.2d 736 (1961), for the proposition that "[c]ontracts for the conveyance of real estate, or any interest therein, are not required to be recorded." *Id.* at 742, 744. However, *Westpark* addressed the applicable rules for determining which of two competing purchasers is the bona fide owner when a property is sold to one party before another party's right of refusal has lapsed. *Id.* at 742. It therefore involved a simple transfer of real property without the severance of the ownership interest in improvements from the ownership interest in the land and thus did not address the requirements to establish ownership for tax purposes. *See id.* The Court therefore relies on the far more factually and legally analogous decisions in *GBMC* and *Townsend*.

The Court thus determines that, as a matter of law, the Manns' donation of the House to Second Chance was not a proper conveyance of an undivided interest in property. Accordingly, the House donation was not a qualifying charitable contribution under § 170 and was not deductible. The Court will therefore grant the IRS's Motion for Summary Judgment as to the House deductions and will deny the Manns' Motion seeking partial summary judgment on whether they donated an undivided interest to Second Chance.

Even if the Court were to find that the Manns had properly severed their interest in the real property from their interest in the House and had properly donated the latter to Second Chance, the Manns would still not be entitled to their original claimed deduction of $675,000 or their amended claimed deduction of $313,353. Charitable contributions of property for which a deduction of more than $5,000 is claimed must be accompanied by a qualified appraisal of the donated property. 26 U.S.C. § 170(f)(11). House Appraisal A, which sought to substantiate a

$675,000 deduction, was invalid because it calculated the value of the House at its highest and best use—intact and relocated to another site for use as a residence—which did not apply to its use by Second Chance. In *Rolfs v. Commissioner*, 668 F.3d 888 (7th Cir. 2012), taxpayers sought to deduct the value of a house on lakefront property that they donated to the fire department to be burned down in a training exercise and used the same valuation method applied in House Appraisal A, specifically, taking the difference between the fair market value of the entire property and the fair market value of the real property sold without the house. *Id.* at 890, 893. The court ruled that the deduction was properly disallowed because the valuation methodology did not account for the condition placed on the donation that the house be burned down. *Id.* at 893–94. Likewise, because the Manns donated the House for the "express purpose" of having Second Chance engage in deconstruction and workforce training, J.R. 494, the valuation methodology used in House Appraisal A was invalid because it did not take into consideration the condition on the conveyance that necessarily reduced the value of the donation. *See id.* at 894–95.

As for House Appraisal B in the amount of $313,353, that appraisal specifically states that it seeks to "determine the fair market value of the donated structure's used building components when sold on the 2nd hand market" by taking the value of new versions of the building materials comprising the House and depreciating those materials based on the age of the House. J.R. 418. The problem with this methodology is again that it is not consistent with the condition on the conveyance that the House would be used for Second Chance's program under which, as the appraisal itself recognizes, Second Chance does not merely dismantle all the building materials and sell them at market value, but it also "has the stated goal of training individuals for reintroduction into the local community." J.R. 419. It is undisputed that some parts of a structure "are necessarily destroyed as part of the deconstruction process" and that some of Second Chance's

training includes deliberately destroying parts of a structure "for the purpose of training," such as destroying a window to show what happens 'if you wedge this too hard.'" JSUF ¶ 23-24. Because of these considerations, the appraiser concluded that the donation of the House to Second Chance was "similar to donating a structure to the local fire department for use in a fire training exercise." J.R. 419. In *Rolfs*, however, such a donation was not valued as the depreciated value of the building materials, but instead was deemed to be of negligible value, because in that case none of the building materials would be salvaged. *See Rolfs*, 668 F.3d at 895. Here, the value of the House was undoubtedly higher than in a fire training scenario because many of the materials would be salvaged, but the conditions of Second Chance's training program necessarily prevented all such materials from being salvaged, such that valuation based on the resale value of all building materials overstated the value of the House.

Rather, as Second Chance's communications to the Manns reveal, the proper way to calculate a tax deduction from this donation is based on the resale value of the specific building materials and contents that "we actually take away from the site" and that "cross[] the threshold" of Second Chance's warehouse. J.R. 508. In fact, after projecting that it would salvage at least $150,000 in material from the House, Second Chance acknowledged that the salvage operation was less successful than hoped, thus illustrating that a valuation of over $300,000 based on the extraction and resale of all building materials does not properly value the donation in light of the conditions placed on the conveyance. Because neither House Appraisal A nor House Appraisal B was a qualified appraisal that properly substantiated the Manns' claimed deductions, and the Manns have not otherwise met their burden to justify those deductions, the Court will grant summary judgment to the IRS on the issue of the donation of the House.

## III. Personal Property

The IRS also contends that the Manns were not entitled to a $24,206 deduction in 2011 for their donation to Second Chance of the Personal Property located inside the House because the appraisal supporting the donation is deficient in several respects. Although the IRS has expressly briefed and sought summary judgment on the issue of the validity of the Personal Property deductions, the Manns have raised no discernible opposition on that score. The Court thus concludes that the Manns have effectively abandoned their claim for the $24,206 Personal Property deduction. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (holding that the "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (finding that the plaintiff had abandoned a claim "by failing to address that claim in her opposition to [the defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief").

Even if the Court did not consider this claim abandoned, it finds the IRS's uncontested arguments persuasive. A qualified appraisal must include the method of valuation used by the appraiser as well as the specific basis for the valuation, "such as specific comparable sales transactions." 26 C.F.R. § 1.170A–13(c)(3)(ii)(J), (K). Here, the appraisal fails in several ways. First, it does not provide the specific basis and documentation for valuing all of the 40 items of household furniture at $372,000 and instead includes fair-market comparators for only a few items. Second, even if the appraisal could substantiate that sum, its ultimate conclusion as to the donation value of the Personal Property would still be flawed because the appraisal does not adhere to its own avowed methodology, which requires both the deduction of certain costs and then depreciation by 42 percent. Instead, items are depreciated haphazardly. The Adirondack chairs

16

are listed at $149.99 and $129.99 new then valued at $100, a depreciation of between 22 and 33 percent. The gas fireplace, listed as $2,778 new and valued at $2,500, was depreciated by only 10 percent. Because the appraisal is internally inconsistent, valuing items by a method other than the one claimed, the Court finds that it fails to include the explanation of the basis for the valuation required by 26 C.F.R. 1.170A–13(c)(3)(ii)(K) and thus is not a qualified appraisal within the meaning of the applicable regulations. The IRS will thus be granted summary judgment as to the Personal Property donation.

## IV.    Cash Donations

The IRS asserts that the Manns' deductions of their cash payments to Second Chance were properly denied because the payments were a *quid pro quo* for Second Chance's deconstruction services and thus not proper charitable donations. The Manns contest this assertion, seeking summary judgment on this issue in their favor because, they argue,   Second Chance's deconstruction services did not reduce the cost to the Manns of the House demolition and the Manns received no discernible benefit from their $11,500 in payments.

To qualify as a charitable contribution under § 170, a donation must be an "unrequired payment[] to [a] qualified recipient," as distinguished from a payment made "in return for goods and services." *Hernandez v. Comm'r Internal Revenue*, 490 U.S. 680, 690 (1989).   That is, a charitable contribution under § 170 is a donation made without "the expectation of any quid pro quo." *Id.* (citing S. Rep. No. 1622, 83d Cong., 2d Sess., 196 (1954)).   Determining whether a particular payment was made with the expectation of any *quid pro quo* involves looking at the external features of the transaction, not the subjective motivations of the taxpayer. *Id.* at 690–91. A transaction is structured as a *quid pro quo* if "it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and

where the taxpayer cannot receive the benefit unless he pays the required price." *Miller v. I.R.S.,* 829 F.2d 500, 503 (4th Cir. 1987) (citation omitted).

Here, Second Chance is a non-profit corporation to which charitable donations can be made under § 170, but except in instances where salvaging contents of a property has historical importance, Second Chance requires donors of structures and their contents to make a cash donation to defray the cost of deconstruction, an arrangement called a "funded deconstruction." JSUF ¶ 26. In outlining the tax benefit of its services, Second Chance specifically stated to the Manns that their tax savings would come primarily from deducting the value of materials salvaged from the House. By way of example, Second Chance estimated that it would collect a "conservative minimum" of $150,000 in salvaged material, which would translate to a tax savings of approximately $45,000. J.R. 508. The required cash donation, in this case $20,000, would then reduce the Manns' overall savings. The Manns agreed to make the $20,000 cash donation over two years. Ultimately, the Manns donated only $11,500 to Second Chance: $10,000 in December 2011, after the deconstruction had begun, and $1,500 in December 2012. Second Chance deemed such cash donations tax deductible and provided the Manns with documentation that it received no value in exchange for such cash donations. The Manns claimed both donations on their tax returns for the respective years. As it turned out, the cost to Second Chance of its deconstruction of the House was $13,144.35, it does not appear to have collected $150,000 in materials, and the deconstruction did not reduce the cost to the Manns of demolishing the House.

The IRS asserts that the Manns' cash donations to Second Chance collectively were a *quid pro quo* payment for deconstruction services that do not qualify as charitable donations under § 170. It is undisputed that the Manns were effectively required to make a cash donation in order

18

for Second Chance to accept the donation of the House and its contents. However, the Manns are correct that they received no "specific benefit in return." *See Miller*, 829 F.2d at 503.

Second Chance's arrangement with the Manns and other donors is analogous to the donation structure in *Scheidelman v. Commissioner of Internal Revenue*, 682 F.3d 189 (2d Cir. 2012). In *Scheidelman*, a homeowner sought to donate a "façade conservation easement" for her historic row-house home to the National Architectural Trust that would forever prohibit the owner of the home from altering the façade without permission of the Trust. *Id.* at 192. Because the easement had monetary value and would reduce the value of the homeowner's interest in the property, the donation could qualify as a tax-deductible contribution. *Id.* However, in order to donate the easement, the homeowner was required by the Trust to make a cash contribution of 10 percent of the value of the easement toward the costs of administration and maintenance of the easement, such as staff time, travel time, and legal services to enforce it. *Id.* at 200. Although the IRS disallowed a tax deduction for the cash donation on the theory that it was a *quid pro quo*, the United States Court of Appeals for the Second Circuit held that although the cash contribution was required, it was a not a *quid pro quo* because the homeowner received no specific benefit in return other that the Trust's acceptance of the easement donation. *See id.* The court found that "[a] donee's agreement to accept a gift does not transfer anything of value to the donor, even though the donor may desire to have his gift accepted, and may expect to derive benefit elsewhere (such as by deductibility of the gift on her income taxes)." *Id.* at 200. The court further noted, "It is true the taxpayer hoped to obtain a charitable deduction for her gifts, but this would not come from the recipient of the gift. It would not be a quid pro quo." *Id.*

The Court finds the Second Circuit's analysis persuasive and applicable. Here, the Manns gave a required cash contribution in order to secure Second Chance's agreement to accept its

donation of the House and its contents. As in *Scheidelman*, the Manns did so not to secure some

tangible goods or service in return, but to secure the ability to make a donation to a charitable cause

and to obtain a tax deduction, which is not a specific benefit from Second Chance. *See id.*

The IRS argues that the specific benefit of the cash donation was the deconstruction

services and notes that such services are available from for-profit businesses. However, where the

Manns had already executed agreements transferring ownership of the components and contents

of the House to Second Chance, the deconstruction services actually benefited Second Chance, not

the Manns, by allowing the charity to administer the Manns' gift by converting the overall donation

into components that could be sold for value, and to fulfill Second Chance's mission of providing

workforce training to disadvantaged individuals. Thus, the cash donation was comparable to the

one made in *Scheidelman*, where the cash donation allowed the Trust to cover the cost of services

necessary to realize the benefit of the donated easement, including marketable legal services to

enforce the easement. *See id.* "When a cash contribution (even mandatory in nature) serves to

fund the administration of another charitable donation, it is likewise an unrequited gift." *Id.*

Significantly, the objective contours of the transaction are such that the deconstruction

services did not provide any collateral benefit to the Manns. There is no evidence that the Manns

had any need or reason to conduct a deconstruction of the House before undertaking its demolition

and the building of their new residence, other than to facilitate a charitable donation and resulting

tax deduction. It is undisputed that "[t]he deconstruction of the House did not decrease Plaintiffs'

cost of having the House demolished." JSUF ¶ 56. Thus, unlike in *Rolfs*, where the donor of a

house to the fire department to be burned down during a training exercise benefited by saving the

cost of demolition, the deconstruction did not provide the Manns with the benefit of not having to

engage demolition services. *See Rolfs*, 668 F.3d at 895-96. If anything, the record shows that the

deconstruction hindered the progress of the demolition. To the extent that the Manns acknowledged that in making the cash donations they wanted to support the workforce training mission and environmentally beneficial work of Second Chance, such intangible, psychic benefits are the hallmarks of a charitable donation, not a transaction for goods or services. In the end, where complete demolition is contemplated and will need to be fully paid for regardless of deconstruction activities, there is no benefit to the Manns or comparable donors from a deconstruction other than the expected tax deduction, which is not a "specific benefit" transforming the donation into a *quid pro quo* because, as the Second Circuit reasoned, "[i]f the motivation to receive a tax benefit deprived a gift of its charitable nature under Section 170, virtually no charitable gift would be deductible." *Scheidelman*, 682 F.3d at 200.

Where the only arguable benefit from the cash donation and the deconstruction work was the expectation of a later tax deduction, this case is distinguishable from other examples of required cash donations made in exchange for an actual good, service, or other definable benefit provided by the recipient of the donation. *See, e.g.*, *Hernandez*, 490 U.S. at 685, 691 (holding that fixed, required donations to the Church of Scientology in order to gain access to "auditing and training sessions" were a "quintessential" *quid pro quo* because, "in return for their money, petitioners received an identifiable benefit, namely auditing and training sessions" from the Church); *Murphy v. Comm'r of Internal Revenue*, 54 T.C. 249, 253 (1970) (holding that mandatory adoption fees were not charitable contributions under § 170 where the taxpayers had received "a significant and direct benefit" for the payments in the form of services indispensable to their ability to adopt a child). Because the record establishes no benefit to the Manns from Second Chance's deconstruction services other than the potential for a tax deduction on the donated House and

Personal Property, the Court concludes that cash donations were not a *quid pro quo* but were instead properly deductible. *Scheidelman*, 682 F.3d at 200.

Based on this finding, the Court need not address whether any portion of the donations exceeded the cost of deconstruction services to Second Chance. The Court thus finds that the Manns were entitled to claim a charitable deduction on their 2011 tax return based on the $10,000 cash donation to Second Chance and a deduction on their 2012 tax return based on the $1,500 cash donation to Second Chance.

## CONCLUSION

For the foregoing reasons, the IRS's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically, the IRS's Motion is GRANTED as to the House and Personal Property deductions and DENIED as to the cash deductions. The Manns' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. Specifically, it is GRANTED as to the cash deductions and is otherwise DENIED. A separate Order shall issue.

Date: January 31, 2019

THEODORE D. CHUANG
United States District Judge